# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

In re:

UNITED REFUSE LLC,

       Debtor.

Case No.   04-11503-RGM
(Chapter 11)

UNITED REFUSE LLC,

       Plaintiff,

vs.

JAMES C. LEHNER and
SUZANNE LEHNER,

       Defendants.

Adv. Proc. No. 05-1551

## <u>MEMORANDUM OPINION</u>

       This case is before the court on the motions for reconsideration filed by the plaintiff, United

Refuse LLC,[1] and by the defendants, James C. Lehner and Suzanne Lehner.

---

[1] The initial pleading in this adversary proceeding was filed on November 16, 2005, and is entitled "Objection to Claims and Counterclaim."  (Docket Entry 1).  It is divided into two parts, the first entitled "Objection to Claims" objecting to proof of claim 28 filed by James C. Lehner and Suzanne Lehner in which both United Refuse and United Leasing Corporation were the moving parties; and the second entitled "Counterclaim" seeking a money judgment against them in which only United Refuse was the moving party.  An objection joined with a demand for relief of the kind specified in Fed.R.Bankr.P. 7001 is an adversary proceeding. Fed.R.Bankr.P. 3007.  The same pleading was filed in the bankruptcy case on November 9, 2005. (*In re United Refuse LLC,* Case No. 04-11503, Docket Entry 293).  The Lehners did not respond to the pleading filed in the main case and on December 12, 2005, the court entered an order disallowing their proof of claim.  (*In re United Refuse LLC,* Case No. 04-11503, Docket Entry 300).  The Lehners filed a timely answer in this adversary proceeding on December 29, 2005.  The trial in this case proceeded only on United Refuse's counterclaim because the objection to the proof of claim had been determined in the main case.  There is no pleading entitled "Complaint" in this case, the "Counterclaim" serving that function.

## **Background**

This is a suit by United Refuse, the debtor, to recover certain amounts from James C. Lehner and Suzanne Lehner, the former managers of the debtor.  The background of this bankruptcy and of the relationship between the parties has been set out before and need not be repeated.  *See* Transcript of Court's Ruling, *United Refuse LLC v. United Leasing Corporation (In re United Refuse LLC),* AP 04-1196 (Bankr.E.D.Va., Mar. 14, 2005) (Docket Entry 147)[2]; Transcript of Hearing, *United Refuse LLC v. James C. Lehner and Suzanne Lehner (In re United Refuse),* AP 05-1551 (Bankr.E.D.Va., Aug. 16, 2006) (Docket Entry 46); Memorandum Opinion, *In re United Refuse LLC,* Case No. 04-11503 (Bankr.E.D.Va., Dec. 20, 2006) (Docket Entry 392)[3]; Memorandum Opinion in *In re United Refuse LLC,* Case No. 04-11503 (Bankr.E.D.Va. June 7, 2007) (Docket Entry 420).  It is sufficient to note here that James C. Lehner was the sole manager of United Refuse until June 2003, when Suzanne Lehner also became a manager.  They were both managers from June 2003 to March 14, 2005, when the court ruled that they held legal title to United Refuse for the benefit of United Leasing Corporation which held all of the beneficial ownership of United Refuse and were removed by United Leasing.  *See* Order and Supplemental Order, *United Refuse LLC, v. United Leasing Corporation,* Adv.Proc. 04-1196 (Mar. 14, 2005 and Mar. 15, 2005) (Docket Entries 142 and 143).  On November 16, 2005, nine months after management of United Refuse was returned to United Leasing, United Refuse commenced this case seeking to recover payments it alleged were improperly made to, or for the benefit of, the Lehners.  After a four-day trial, the court

---

[2]The transcript was introduced as Exhibit 91 in this case by United Refuse.

[3]United Refuse and United Leasing seek recusal of this judge, the withdrawal of the Memorandum Opinion and the vacation of the order in that matter, which was the fee application of United Refuse's accountant.  Their motion was decided earlier today.

announced its ruling on August 16, 2006.  Both parties seek reconsideration of various aspects of

the ruling.

### Managers' Duties and Standard of Conduct; Burden of Proof; and Applicability of Va. Code (1950) §13.1-1024.1

The first matters the court must address are the duties the Lehners owed to United Refuse;

the standard of conduct for the discharge of those duties; the of proof; and the applicability of

Va.Code (1950) §13.1-1024.1.  United Refuse asserts that the Lehners were managers of United

Refuse until March 14, 2005,  Mr. Lehner from the beginning and Mrs. Lehner from October 22,

2003;[4] that as managers they were fiduciaries of United Refuse; and as fiduciaries, they owed

"United Refuse the duties of diligence, the exercise of sound and informed judgment, loyalty, good

faith, and fair dealing."  Counterclaim, ¶¶5 and 6 (Docket Entry 1).  It alleged 16 different breaches

of these fiduciary duties.[5]

---

[4]It also alleged that Mrs. Lehner was an employee of United Refuse from May 2003 until October 22, 2003, and that as an employee she also owed fiduciary duties to United Refuse.  *See, e.g., Williams v. Dominion Technology Partners, L.L.C.,* 265 Va. 280, 289, 576 S.E.2d 752, 757 (2003); *Horne v. Holley,* 167 Va. 234, 241, 188 S.E. 169, 172 (1936).  United Refuse did not allege separate or additional breaches of  her employee-fiduciary duties.

[5]The 16 allegations of misconduct are:

7. In breach of their fiduciary duties to United Refuse, James C. Lehner and Suzanne Lehner did, directly or by their direction:

*a.* Pay to or for themselves, or one of them, out of the assets of United Refuse, personal expenses, including but not limited to meals, lodging, gasoline, home repairs and improvements, magazine subscriptions, vacations, and legal fees;
*b.* Cause or allow contractors to inflate billings to United Refuse in excess of the fair value of the work performed and, upon information and belief, take "kickbacks" from one or more such contractors;
*c.* Work for only two or three days per week;
*d.* Take compensation from United Refuse in excess of the fair value of the services they performed;
*e.* Cause or permit employees of United Refuse to make trash pickups from persons not customers of United Refuse, to retain the monies paid to them by such non-customers, to dispose of such trash at the cost of United Refuse, and upon information and belief, take "kickbacks" from employees of United Refuse to permit such activities;
*f.* Implement a policy of paying commissions to salespersons of UnitedRefuse for collecting the accounts
(continued...)

3

Limited liability companies are creatures of statute and the first place to look for the relationship between members of a limited liability company and the company itself is the Virginia Limited Liability Act. Va.Code (1950) §13.1-1000 *et seq.* The Virginia Limited Liability Company Act was enacted in 1991. 1991 Va. Acts of Assembly c. 168. For brief background considerations, *see KMK Factoring, L.L.C. v. McKnew (In re McKnew)*, 270 B.R. 593, 628 (Bankr.E.D.Va.2001), where the court stated, "The limited liability company is a business form that combines the limited liability of a corporation with the pass-through tax status, which is characteristic of the general partnership, limited partnership, and the S corporation." *McKnew* at 705 (footnote omitted). In accomplishing this merger of partnership and corporate attributes, the General Assembly addressed the issues of the relationship of members to various other parties: to third parties in Article 4 of the Act, Va.Code (1950) §13.1-1019 to - 1021.1; and to other members

---

[5](...continued)

payable of United Refuse, including the current accounts payable, out of which commissions the salespersons made "kickbacks" to the Lehners;

*g.* Falsely report the sales taxes owed to the District of Columbia Government;

*h.* File a petition on behalf of United Refuse in bankruptcy for the purposes of keeping themselves in positions of management and control of United Refuse, and of maintaining the false claim of their personal ownership of United Refuse;

*I.* Initiate an adversary proceeding to contest the validity of obligations of United Refuse to United Leasing Corporation, not for the benefit of United Refuse but in a false attempt to create value for their personal claim of ownership of United Refuse;

*j.* Commence or contest various contested matters for the purpose of maintaining their control of United Refuse for their personal benefit;

*k.* Falsely report to this Court, the United States Trustee, and United Leasing Corporation the "cash collateral" of United Leasing Corporation for the purpose of maintaining their control of United Refuse for their personal benefit;

*l.* Falsely report to this Court and the United States Trustee that all taxes due had been paid when, if fact, the Lehners knew that sales taxes were due to the Government of the District of Columbia and that no such sales taxes were paid at any time during the tenure of the Lehners as managers of United Refuse as debtor in possession, all for the purpose of maintaining their control of United Refuse for their personal benefit;

*m.* Falsely report to this Court and the creditors of United Refuse that their personal creditors were creditors of United Refuse;

*n.* Seek authorization of this Court to permit payment to their personal creditors out of the assets of United Refuse;

*o.* File a false and fraudulent proof of claim against United Refuse; and

*p.* Fail to manage United Refuse for the benefit and in the interests of United Refuse.

4

of the company in Article 5, Va.Code (1950) §13.1-1022 to -1028.  Both draw on aspects of the

Virginia Revised Uniform Limited Partnership Act, Va.Code (1950) § 50-73.1 *et seq.*, the Virginia

Uniform Partnership Act, Va.Code (1950) § 50-73.79 *et seq.* and the Virginia Stock Corporation

Act, Va.Code (1950) §13.1-601 *et seq.*

The relationship between managers and a limited liability company is an agency relationship.

Section 13.1-1021.1(A)(1) provides (subject to subsections B and C of §13.1-1021.1) that "Each

member is an agent of the limited liability company for the purpose of its business."  Va.Code

(1950) §13.1-1021.1(A)(1).  Subsection B alters this relationship in the case of a manager-managed

limited liability company.  In this instance, only managers are agents of the company.  Members are

not.  Va.Code (1950) §13.1-1021.1(B)(1) and (2).

An agent is a fiduciary of his principal.  It follows that a manager of a limited liability

company is a fiduciary of the limited liability company and owes fiduciary duties to it.  *Gowin v.*

*Granite Depot, LLC,* 272 Va. 246, 258, 634 S.E.2d 714, 722 (2006) (suit for breach of fiduciary

duty); *Flippo v. CSC Associates III, L.L.C.,* 262 Va. 48, 56 n.1, 547 S.E.2d 216, 221 n.1 (2001) (suit

for breach of fiduciary duty); *In re McKnew*, 270 B.R. at 629 (dischargeability complaint for breach

of fiduciary duties).

While the fiduciary duties of managers are not enumerated in the Virginia Limited Liability

Act, the Virginia Supreme Court indirectly addressed the issue when it discussed Va.Code (1950)

§13.1-690(A) which establishes the standard of conduct for corporate directors.  This statute is

virtually identical to Va.Code (1950) §13.1-1024.1 which establishes the standard of conduct for

limited liability company managers.  The Virginia Supreme Court discussed the relationship of

§13.1-690(A) to director's duties and to their discharge of their duties.  It stated, "Code §13.1-

690(A) does not abrogate the common law duties of a director.  It does, however, set the standard

by which a director is to discharge those duties." *Willard v. Moneta Building Supply, Inc.,* 258 Va.

140, 151, 515 S.E.2d 284 (1999).  This statement was reaffirmed in   *Simmons v. Miller,* 261 Va.

561, 577, 544 S.E.2d 666, 676 (2001).  Section 13.1-1024.1  is  virtually  identical  to  §13.1-690.

*Flippo,* 262 Va. at 56, 547 S.E.2d at 221.  Thus, the common-law fiduciary duties of agents to their

principals are the duties owed by managers to their company.  Section 13.1-1024.1 neither expands

nor contracts them.

Section 13.1-1024.1 establishes the standard by which managers are to discharge their duties.

It consists of four subsections.  Subsection A establishes the standard of conduct.  Subsection B

establishes safe harbors for managers in the discharge of their duties.  Subsection C establishes the

burden of proof.  Subsection D defines the term "manager" for purposes of §13.1-1024.1.

Section 13.1-1024.1(A) states:

A manager shall discharge his or its duties as a manager in accordance with the
manager's good faith business judgment of the best interests of the limited liability
company.

Va.Code (1950) §13.1-1024.1.  It is comprehensive.  It controls the exercise of all duties of a

manager as a manager without regard to the source of the duty.  It controls the standard of conduct

of the discharge of all duties – fiduciary and otherwise – that a manager owes to the company and

that are discharged by him as a manager.  This is the standard of conduct required of the Lehners

in this case for actions taken by them as managers.  It is the standard by which their conduct is

measured.

Subsection B has limited applicability in this case.  It enables managers to rely on

information, opinions, reports or statements prepared by certain other persons (including attorneys)

6

in the exercise of their business judgment unless the manager "has knowledge or information concerning the matter in question that make reliance unwarranted." Va.Code (1950) §13.1-1024.1(B). Except for the decision to place United Refuse in bankruptcy and the decisions made in prosecuting the bankruptcy, the actions United Refuse complains of were not taken in reliance on advice of counsel.

Subsection C establishes the burden of proof. It states, "A person alleging a violation of this section has the burden of proving the violation." Va.Code (1950) §13.1-1024.1(C). In this case, United Refuse bears the burden of proof.

United Refuse argues that Va.Code (1950) §13.1-1024.1 "has no impact on any part of the case." Supplemental Brief on Burden of Proof at 1 (Docket Entry 52). It argues that §13.1-1024.1 is a statutory business judgment rule and does not apply in cases of breach of fiduciary duties. It says that the Virginia Supreme Court in *Flippo* and *Simmons* held that "the statutory protection was inapplicable . . . because such breaches of fiduciary duty are not breaches of the duty of care owed to the LLC or corporation but, rather, breaches of the duty of loyalty." Supp.Br. at 2. Quoting *Simmons,* it asserts that §13.1-1024.1 "is confined to the exercise of business judgment on behalf of the corporation." *Id.* It continues:

> In the instant case, United Refuse does not assert that either or both the Lehners failed properly to exercise their business judgment on behalf of the LLC. Rather, every allegation of wrongdoing is a breach, as in both *Flippo* and *Simmons,* of the Lehners' fiduciary duties through self-dealing – the use of the assets of United Refuse for *themselves* . . .

Supp.Br. at 2-3. (Emphasis in original).

Eliminating the applicability of §13.1-1024.1, United Refuse then argues that the burden of proof applicable to fiduciaries applies in this case. The Lehners, United Refuse asserts, breached

7

their duty of loyalty by self-dealing, that is, they expended company funds for personal benefits

thereby acquiring an interest in the subject matter of the relationship with every such transaction.

Citing a Virginia Circuit Court decision, it asserts that, "If a fiduciary does acquire such an adverse

interest, 'it is *prima facie* presumed to be invalid and the fiduciary must bear the burden of proving

that the transaction was valid.' *Roscigno v. DeVille,* 28 Va.Cir. 96, 103 (Fairfax Cty. 1992)."

Supp.Br. at 3.  It continues:

> United Refuse has proved literally hundreds of transactions in which the
> Lehners "aquire[d] an interest in the subject matter [the assets of United Refuse]
> adverse to" the interests of United Refuse.  Every time the assets of United Refuse
> were put into the hands of the Lehners, or they caused United Refuse to pay for their
> expenditures, the Lehners acquired an interest adverse to United Refuse and were
> required to "bear the burden of proving that the transaction was valid."

*Id.* at 4.  United Refuse concludes:

> This case is one for breach of fiduciary duty. Once United Refuse has shown
> that funds were taken out of United Refuse by the Lehners, it is *their* burden to show
> the propriety of their having done so – that it was for the benefit of United Refuse
> and solely for the benefit of United Refuse, without benefit to them.

*Id.* at 5.

*Flippo* is an illuminating case, but United Refuse misreads it.  *Flippo* was a suit for "breach

of fiduciary duty to the limited liability company." *Flippo,* 262 Va. at 53, 547 S.E.2d at 219.  The

defendant-managers organized a second limited liability company, formed a joint venture between

the original company and the newly organized company, transferred the assets of the original

company to the joint venture and then dissolved the original company, all to the detriment of the

plaintiff-members of the original company.   Some of these actions required action taken as

managers of the original company.  The defendant-managers acted on the advice of counsel.  The

state court refused to permit the defendant-managers to rely on Va.Code (1950) §13.1-1024.1(B)(2),

the safe harbor of advice of counsel, and found that the defendant-managers breached their fiduciary duties to the plaintiff-members.  The Virginia Supreme Court affirmed.  There was no discussion in the opinion about whether the reorganization independently met the provisions of §13.1-1024.1(A), that is, that the reorganization was undertaken in the defendant-manager's "good faith business judgment of the best interests of the limited liability company."  The fair reading of the opinion is that it was not.  It had an adverse impact on the company.  *Flippo*, 262 Va. at 57, 547 S.E.2d at 221.  Thus, if the defendant-managers had sought to rely solely on §13.1-1024.1(A), the exercise of their good faith business judgement, they would have lost.  However, the defendant-managers argued that they acted within one of the safe harbor provisions of §13.1-1024.1(B) and, therefore, did not breach Va.Code (1950) §13.1-1024.1.

It is helpful to understanding *Flippo* to digress a moment and examine the operation of the safe harbor provisions. The safe harbor provisions of §13.1-1024.1(B) are virtually the same as those of the Virginia Stock Corporation Act, §13.1-690(B) which the Virginia Supreme Court discussed in *Willard*.  The Supreme Court compared §13.1-690 with §8.30 of the Revised Model Business Corporation Act ("RMBCA") and concluded that Va.Code (1950) §13.1-690 is process oriented, not result oriented.  It stated:

> The contrast between the provisions of Code §13.1-690 and those contained in §8.30 of the RMBCA convinces us that, in Virginia, a director's discharge of duties is not measured by what a reasonable person would do in similar circumstances or by the rationality of the ultimate decision. Instead, a director must act in accordance with his/her good faith business judgment of what is in the best interests of the corporation. Thus, the *Revlon* test [*Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173 (Del.1986)] is not applicable in Virginia.

*Willard*, 258 Va. at 151, 515 S.E.2d at 284.  It continued,

> Turning to the facts of the present case, we agree with the circuit court's judgment that A.S. and Rose Mary engaged in an informed decision-making process.

9

> Pursuant to Code §13.1-690(B), a director can rely on information and opinions
> from, *inter alia,* legal counsel, accountants, and other experts unless the director has
> knowledge that such reliance is unwarranted. Thus, a director may use an informed
> decision-making process in discharging the duties of the office as long as the director
> does so in good faith. *See WLR Foods,* [*Inc. v. Tyson Foods, Inc.,* 65 F.3d 1172, 1185
> (4th Cir.1995)]. When a director resorts to such a process, the ultimate decision must
> still reflect the director's "good faith business judgment of the best interests of the
> corporation" in order to receive the benefit of the "safe harbor" afforded in Code
> §13.1-690(C).

*Id.* 258 Va. at 152, 515 S.E.2d at 285.  In footnote 12, it elaborated further.  The trial court had

sustained an objection to discovery requests that went to the correctness of the directors' decision.

It stated:

> Because the objective reasonableness of a director's decision or conduct is not a
> relevant inquiry under §13.1-690, we also conclude that the circuit court correctly
> held that Willard was not entitled to discover the substance of certain legal and
> financial advice that the defendants received. *See WLR Foods*, 65 F.3d at 1187.

 *Id.* 258 Va. at 153, 515 S.E.2d at 286.

This understanding of the application of the safe harbor provisions set the stage in *Flippo*

for the argument that, although the managers' decision to reorganize the company was wrong, the

managers were not liable because their decision came within the safe harbor provision of §13.1-

1024.1(B)(2), advice of counsel.  The safe harbor defense was rejected because the legal advice

upon which the managers acted did not qualify under §13.1-1024.1(B)(2).  The Virginia Supreme

Court stated:

> [T]o come within the protection of subsection (B) of Code §13.1-1024.1, the legal
> advice which [the defendant-managers] received and acted upon must have been
> advice sought in good faith for the benefit of the company.

*Flippo,* 262 Va. at 57, 547 S.E.2d at 222.  The legal advice was "given solely for the purpose of

implementing the Flippos' personal estate planning goals."  *Id.*  The reorganization "was neither

sought nor taken with the intent of benefitting" the company.  *Id.*  In short, the legal advice the

10

defendant-managers obtained was for their benefit, in their individual capacities, to advise them how to further their objectives. It was not obtained for the benefit of the company or to further the company's objectives. The legal advice did not meet this standard and the safe harbor was unavailable. Va.Code (1950) §13.1-690(B). The requirements of the safe harbor provision of §13.1-1024.1(B)(2) not having been satisfied, they were held liable for their misconduct which was a breach of their fiduciary duty.

*Flippo* is not a case where the standard of conduct in §13.1-1024.1 was not applicable because the case concerned the breach of a fiduciary duty. The standard was applicable. The managers fell short of the standard. The safe harbor provision did not save them, not because the case was one concerning the breach of a fiduciary duty, but because it was factually not applicable.

United Refuse also cites *Simmons*. While relevant, it does not support United Refuse's argument. *Simmons* reiterates that the protection of the business judgment rule only applies if the action is taken as a director in the performance of his or her office. *Id.* 261 Va. at 577, 544 S.E.2d at 676. In *Simmons*, a case involving a corporation under §13.1-690, the director organized a competing entity. This act was not a corporate act taken by the director in her capacity as a director, but the director's personal act in her personal capacity for her personal benefit. As such, §13.1-690 offered no protection. While liability was predicated on the director's breach of her duty of loyalty, §13.1-690 was unavailable not because the issue in the case was the breach of a fiduciary duty – the duty of loyalty – but because the duty was breached in the director's individual capacity, not in her capacity as a director. The Supreme Court explained:

> Code §13.1-690 applies to the "discharge [of] duties as a director," and makes no distinction between duties of care and loyalty. . . . However, the protection of §13.1-690(C) applies only to acts "taken as a director, or any failure to take any action," and is confined to the exercise of business judgment on behalf of

11

the corporation.  When the acts in question do not meet these criteria, Code §13.1-690 does not apply.

Comparison of *Flippo* and *Simmons* helps highlight the operation of Va.Code (1950) §§13.1-690 and 13.1-1024.1.  The managers' conduct in *Flippo* was measured by the standard set out in Va.Code (1950) §13.1-1024.1 because the actions they took were company actions, that is, the reorganization of the company.  In *Simmons,* however, Va.Code (1950) §13.1-690 was not applicable because the director's actions – organizing a competing entity – were not corporate actions.  They were individual actions.  In *Flippo,* the managers sought to place their actions within one of the safe harbors, but the safe harbor, advice of counsel, was factually inapplicable.  In *Simmons,* the safe harbors were inapplicable because Va.Code (1950) 13.1-§690 was wholly inapplicable.  Her actions were taken in her individual capacity, not in her corporate capacity.  In *Flippo,* the discussion of the applicability of the safe harbor would have been unnecessary if the managers were not acting within their company capacities as managers.  Because they were, the safe harbor offered a defense, but the defense was unsuccessful.

*Flippo* and *Simmons* teach that §13.1-1024.1 is the exclusive standard of conduct for managers of a limited liability company, including the discharge of their fiduciary duties.  In *Simmons,* the business judgment rule, Va.Code (1950) §13.1-690, was not applicable.  The director's action was undertaken in her individual capacity, not in her corporate capacity.  The safe harbor defense in *Flippo* was disallowed not because the issue was whether there was a breach of a fiduciary duty, but because the safe harbor defense was not established.  Had the managers consulted counsel about a  company problem that required their action as managers of the company to solve, the safe harbor defense would have been available and they could have prevailed, even if the advice of counsel had been wrong or the decision turned out to injure the company.  That is because §13.1-

12

1024.1 is a process-oriented standard of conduct, not a result-oriented standard.  *See generally,*

*Willard*, 258 Va. at 151, 515 S.E.2d at 284.

   The gist of United Refuse's argument on the applicability of Va.Code (1950) §13.1-1024.1

is that §13.1-1024.1 applies only to the business judgment of managers in the operation of the

company.  "United Refuse does not assert that either or both of the Lehners failed properly to

exercise their business judgment on behalf of the LLC.  Rather, every allegation of wrongdoing is

a breach .  .  . of the Lehners' fiduciary duties through self-dealing." Supp.Br. at 2-3. Section 13.1-

1024.1, United Refuse asserts, is not applicable in this case because the case concerns a breach of

a fiduciary duty and not a breach of care.  The case law is to the contrary.  Section 13.1-1024.1

"makes no distinction between duties of care and loyalty."  *Simmons,* 261 Va. at 577, 544 S.E.2d

at 676.  Thus, all provisions of Va.Code (1950) §13.1-1024.1 are applicable for all actions taken by

the Lehners in their capacity as managers of United Refuse.

   United Refuse did not address the essential issue raised in *Simmons*.  After holding that

§13.1-690 makes no distinction between duties of care and loyalty, the Supreme Court added:

> However, the protection of §13.1-690(C) applies only to acts "***taken as a director***,
> or any failure to take any action," and is confined to the exercise of business
> judgment on behalf of the corporation.  When the acts in question do not meet these
> criteria, Code §13.1-690 does not apply.

*Simmons,* 261 Va. at 577, 544 S.E.2d at 676 (emphasis added).  The corresponding provision of the

Virginia Limited Liability Company Act contains virtually identical language.  Section 13.1-1024.1

states, "A manager shall discharge his or its duties as a manager .  .  ." The same construction is

appropriate.

   Did the Lehners act as managers in the matters before the court?  United Refuse was manager

managed.  The scope of a manager's authority is broad.  Va.Code (1950) §13.1-1022(A) states:

13

> Except to the extent that the articles of organization or an operating agreement provides in writing for management of a limited liability company by a manager or managers, management of a limited liability company shall be vested in its members.

Va.Code (1950) §13.1-1022(A).  The two principal areas of concern were the decision to file bankruptcy and the decisions related to the establishment and operation of the reimbursement and credit card use policies.  The decisions to file bankruptcy and the decisions made in prosecuting the bankruptcy are decisions made by managers for and on behalf of the company.  They are company acts.  They clearly fall within the parameters of Va.Code (1950) §13.1-1024.1.  *See* LBR 1074-1 (requiring filing of corporate resolution authorizing filing of bankruptcy).

The establishment and operation of company reimbursement and credit card use policies are typical corporate, partnership and company activities.[6]  Almost all entities recognize that all business expenditures cannot be paid with business funds in the first instance.  Reimbursement plans assure the orderly operation of the business and proper reimbursement of employees.  The decisions relating to the establishment and operation of these reimbursement plans, whether formal or informal, are within the purview of a manager's duties in a limited liability company.  A manager is making decisions for and on behalf of the company concerning the expenditure of company money.  This does not immunize a manager from the consequences of wrong decisions made in connection with reimbursements.  He must still properly discharge his duties to the company.  The test for whether a manager violates his duty to the company is established by Va.Code (1950) §13.1-

---

[6]For example, the Restatement (Third) of Agency, Duty To Indemnify, §8.14 (2006) states: "A principal has a duty to indemnify an agent (1) in accordance with the terms of any contract between them; and (2) unless otherwise agreed, (a) when the agent makes a payment (I) within the scope of the agent's actual authority, or (ii) that is beneficial to the principal, unless the agent acts officiously in making the payment. . ." *See also* Restatement (Second) of Agency, §438 cmt. B (1958).  The Virginia Uniform Partnership Act provides that a "partnership shall reimburse a partner for payments made and indemnify a partner for liabilities incurred by the partner in the ordinary course of the business of the partnership or for the preservation of its business or property."  Va.Code (1950) §50-73.99(C).

1024.1.  For example, he may fail to properly discharge his duties by taking reimbursements for personal, non-business expenses.  In this case, the  Lehners were acting in their capacities as managers  with respect to authorizing reimbursements to themselves.

The Lehners' actions may be compared to those in *Flippo* and *Simmons*.  Here, the Lehners' actions were, like those in *Flippo,* company actions.  They were decisions that caused the company to file bankruptcy and that caused the company to expend company money.  The fact that the expenditures were for reimbursements for themselves rather than for other employees or for payment of counsel fees for the bankruptcy or landfill fees for dumping the trash collected is not material. They were all decisions made by managers to expend company money.  The Lehners could have taken an action that was not a company action, such as in *Simmons*, but that was not what this case was about.  Thus, the question is whether the company actions the Lehners took satisfied Va.Code (1950) §13.1-1024.1.

The last matter to be addressed is the burden of proof.  Va.Code (1950) §13.1-1024.1(C) places the burden of proof on the party alleging the violation of Va.Code (1950) §13.1-1024.1. While United Refuse argues that the burden of proof should be on the Lehners, the statute, when applicable, is to the contrary.

In this case, the burden of proof has little practical effect.  Under either the statute or United Refuse's argument, the moving party must first identify the transactions in question.  A manager does not have the burden of proving that every company expenditure made during his tenure was for the benefit of the company.  He is not required to go through every company expenditure and show that every one was for a business purpose such as landfill fees, fuel for the trucks, salaries for the employees, taxes or another business expense.  United Refuse must first show which transactions

are in question.  Simply showing that a credit card charge was made at a restaurant on the company credit card issued to  Mr. Lehner, for example, is not enough.  No inference arises simply because the expense was incurred in this instance.  It may well have been for a business purpose.  In some instances, the very nature of the expense may show its purpose, for example, a landfill expense or a boat slip rental.  In others, the expense itself is ambiguous.  United Refuse must do more than merely point out or question an expenditure.  Burden of proof has a practical effect only when the moving party fails to put forward any evidence, in which case the respondent does not need to put forward any evidence, or where the evidence put forth by both parties is in equipoise and the court is unable to make a determination on the evidence.  The latter is not common.

### Discussion

United Refuse makes 16 different allegations against the Lehners.  The court will discuss them in seven groups: Filing and Prosecution of the Bankruptcy Petition; Sales Taxes; Improper Payments; Kickbacks; Personal Creditors; Proof of Claim; and Mismanagement.

1. **Filing and Prosecution of the Bankruptcy Petition.**  United Refuse alleges that the

Lehners:

>   *h.*  File[d] a petition on behalf of United Refuse in bankruptcy for the purposes of
>   keeping themselves in positions of management and control of United Refuse, and
>   of maintaining the false claim of their personal ownership of United Refuse;
>   *I.* Initiate[d] an adversary proceeding to contest the validity of obligations of United
>   Refuse to United Leasing Corporation, not for the benefit of United Refuse but in a
>   false attempt to create value for their personal claim of ownership of United Refuse;
>   *j.* Commence[d] or contest[ed] various contested matters for the purpose of
>   maintaining their control of United Refuse for their personal benefit

Counterclaim, ¶7 (Docket Entry 1).

The Lehners' duty to United Refuse as managers was  to exercise "good faith business

judgment of the best interests" of United Refuse.  Va.Code (1950) §13.1-1024.1.  In exercising their

business judgment, they were entitled to rely on the advice of counsel.  Va.Code (1950) §13.1-

1024.1(B)(2).  They retained Gregory Wade as counsel for United Refuse who recommended filing

a chapter 11 petition in bankruptcy and filing a complaint to determine the extent and validity of

United Leasing's alleged liens.  They followed Mr. Wade's advice.  Mr. Wade testified that he gave

the advice to file the petition and explained the reasons for his recommendation in response to

questions from the Lehners' attorney:

>   Q      .  .  . [C]ould you tell us, in your words, what the purposes w[ere] of filing
>   for bankruptcy protection in the spring of '04.
>
>   A      It was clear to me that there were tremendous divisions between United
>   Refuse and United Leasing.  And I also recognized that there was a dispute
>   over the ownership of United Refuse.  And, in my judgment, it was better
>   that United Refuse remain an intact company while the dispute could be
>   resolved.
>
>   Q      What do you mean by "an intact company"?
>
>   A      That it remain an operating entity.  The way it was going, it appeared to me,
>   it was going to be torn into pieces, and it was my belief and Mr. Lehner's

17

> belief that he and his wife were the true owners of the company.  And we
> believed and I counseled that, if they were in bankruptcy and kept the
> company together, it would be worth more at the end if he prevailed with an
> entity that was operating than simply have the right to pick up the pieces
> later.

Tr. 07/13/2006, at 5-6 (Docket Entry 28).

While it is unnecessary to show that Mr. Wade's advice was the right advice, it is clear that

it was. *See Willard*, 258 Va. at 152, 515 S.E.2d at 285; *WLR Foods, Inc. v. Tyson Foods, Inc.,* 65

F.3d at 1185 (4th Cir.1995).  Mr. Wade was faced with a situation where United Leasing was

asserting its rights as a creditor against United Refuse.  The foreseeable consequence of United

Leasing's actions, if successful, was the destruction of United Refuse.  There had been litigation in

the state courts.  United Refuse's bank accounts had been attached and its cash flow interrupted.

While some of these actions had been abated, there was no resolution in sight.  The threat to United

Refuse continued.

The problem was not only financial.  It was also ownership of the company.  Both United

Leasing and the Lehners claimed ownership.  When a manager is faced with an existential threat to

the company arising from completing claims of ownership, his loyalty is to the entity, not to either

of the putative owners.  His duty is to preserve the entity until the ownership dispute is resolved by

the contestants.  That was Mr. Wade's advice.  That is what the Lehners did.

United Refuse replies, essentially contesting the Lehners' ability to rely on the safe harbor

of advice of counsel as was done in *Flippo,* by asserting that the Lehners did not act in good faith

and that they knew all along they had no ownership interest in United Refuse and should have

followed the orders of the true owner of United Refuse, United Leasing.  When United Leasing

demanded that they turn over United Refuse to it, they should have done so.  Had they done so, there

18

would have been no state court litigation and no bankruptcy.  United Refuse endeavored to show

that the Lehners could not rely on Mr. Wade's advice because they had "knowledge or information

concerning the matter in question that [made] reliance unwarranted."  Va.Code (1950) §13.1-

1024.1(B).  The knowledge that it asserts that the Lehners had was that they were not the owners,

that United Leasing was the owner.

United Refuse did not prove this.  The issue went largely unexplored.  It appears that United

Refuse was relying primarily on the outcome of the prior case.  It is true that in the prior case,

*United Refuse LLC v. United Leasing Corporation,* Adv. Proc. 04-1196, this court found after an

extensive trial that the Lehners held their ownership interest in United Refuse as constructive

trustees for United Leasing.  That is not enough.  United Refuse must prove more, for example, that

the Lehners acted in bad faith, that they knew that they were not the true owners, that their claim was

specious, or that there was some other reason that made their reliance on advice of  counsel

unwarranted.  This it did not do in either this case or the prior case.  In the prior case where

ownership was extensively litigated, Mr. Lehner asserted that United Leasing, acting through

Edward H. Shield, gave or sold or transferred United Refuse to him.  It is true that at the very

beginning of the relationship Dale Johnson, an employee of United Leasing, cautioned Mr. Shield,

in Mr. Lehner's presence, not to make Mr. Lehner the sole member of United Refuse and warned

him that Mr. Lehner would "take" the company from him.  Mr. Lehner denied he would do this.  The

significance of the statement was not Johnson's prescience, but the acknowledgment by Mr. Shield

and Mr. Lehner of the relationship – that Mr. Lehner held the ownership of United Refuse for the

benefit of United Leasing.  Having established the original relationship, it was incumbent upon Mr.

Lehner to show that it changed.  While subsequent events may have given Mr. Lehner the

19

impression that the relationship changed, the court found that the relationship had not.  However, for United Refuse's purposes in this case, it was necessary to show that the impressions that arose from the parties' conduct were such that reliance on advice of counsel was not warranted.  This was not done.  The facts giving rise to the Lehners' impressions justified Mr. Wade's professional opinion that the Lehners had a "justiciable case."  Tr. 7/13/2006 at 25.

United Refuse also complains about the filing of the complaint styled *United Refuse LLC v. United Leasing Corporation,* Adv. Proc. 04-1196.  That adversary proceeding was an action to determine the validity and extent of liens allegedly held by  United Leasing.  It was essential to resolve this issue if there was to be any successful plan of reorganization and well within a manager's business judgment to initiate.  United Refuse did not prove to the contrary nor did it prove that any other pleading or contested matter was improperly filed or commenced.  These actions were also taken on advice of counsel.

The bankruptcy was properly initiated and prosecuted for the benefit of the company.  The owner – whoever that was – would benefit from a successful reorganization.  The bankruptcy was filed to preserve the company while the putative owners resolved their ownership dispute.  This was accomplished.  As of March 14, 2006, United Refuse continued to exist and continued in business.  It was later sold as a going concern for $2.5 million with all creditors being paid in full except United Leasing which voluntarily subordinated its claims to all other creditors.  In the end, there was no equity available for the benefit of the owner.  The Lehners properly discharged their duties as managers as required under Va. Code (1950) §13.1-1024.1(A) even without considering the safe harbor of Va.Code (1950) §13.1-1024.1(B)(2), a safe harbor upon which they were entitled to rely.

**2. <u>Sales Taxes.</u>**  United Refuse alleges that the Lehners:

20

    *g.* Falsely report[ed] the sales taxes owed to the District of Columbia Government;

    *k.* Falsely report[ed] to this Court, the United States Trustee, and United Leasing Corporation the "cash collateral" of United Leasing Corporation for the purpose of maintaining their control of United Refuse for their personal benefit;

    *l.* Falsely report[ed] to this Court and the United States Trustee that all taxes due had been paid when, if fact, the Lehners knew that sales taxes were due to the Government of the District of Columbia and that no such sales taxes were paid at any time during the tenure of the Lehners as managers of United Refuse as debtor in possession, all for the purpose of maintaining their control of United Refuse for their personal benefit.

Counterclaim, ¶7 (Docket Entry 1).

    United Refuse asserts that the Lehners failed to pay sales taxes to the District of Columbia and filed false monthly reports with the court which stated that all taxes had been paid. There is no question that District of Columbia sales taxes were not paid during the pendency of this bankruptcy case and that they should have been paid. The cumulative amount was about $100,000. Mr. Lehner signed the monthly operating reports that were filed with the court. One question on the report asks if all taxes have been paid. In most instances, Mr. Lehner checked the "yes" line. None of the monthly reports had proof of payment of sales taxes as required by the report. None reflected any were paid on the financial statements. Presumably the same was true of the cash collateral reports submitted to United Leasing.

    It is also true that there was not enough money to pay them. When United Leasing took control on March 15, 2006, it quickly determined that sales taxes were not paid but did not pay them because United Refuse did not have enough money to do so. It started the process of seeking an abatement of penalties and interest with the District of Columbia. At trial, it did not prove the amount of the penalties and interest that had accrued from the non-payment of the sales taxes and in fact, did not even prove the amount, although everyone agreed that it was about $100,000. United Refuse was ultimately successful in having the District of Columbia abate all penalties and interest

21

and paid the sale taxes on August 22, 2006.  *See* Motion to Vacate, ¶1.  (*In re United Refuse,* Case No. 04-11503, Docket Entry 377).

United Refuse proved no damages.  The amount of the sales taxes United Refuse paid on August 22, 2006, is not the measure of damages.  United Refuse always owed the sales taxes.  The damages were, at most, penalties and interest on the late payment through July 1, 2005 when United Refuse first had the funds available to pay the taxes.  Report of Sale, ¶1.  (*In re United Refuse,* Case No. 04-11503, Docket Entry 215).  The amount of the penalties and interest was not proven at trial and no award can be made for it.  In any event, the matter is now moot because the penalties and interest have been abated.

Whether there may have been other consequences from the non-payment of taxes and the misreporting of the status of the payment of the sales taxes to the court is speculative.  It is possible that a chapter 11 trustee would have been appointed or the case converted to chapter 7, but it is not clear what damages, if any, would have flowed to United Refuse had that occurred.

**3.  Improper Payments.**  United Refuse alleges that the Lehners:

*a.*  [Paid] to or for themselves, or one of them, out of the assets of United Refuse, personal expenses, including but not limited to meals, lodging, gasoline, home repairs and improvements, magazine subscriptions, vacations, and legal fees;
*c.*  Work[ed] for only two or three days per week;
*d.*  [Took] compensation from United Refuse in excess of the fair value of the services they performed

Counterclaim, ¶7 (Docket Entry 1).

The court will first address the salary issue.  Mr. Lehner and United Leasing agreed when he first was assigned to United Refuse that his compensation at United Refuse would remain the same as at United Leasing.  He was paid $80,000 a year and certain benefits at United Leasing.  One of those benefits was reimbursement for mileage and travel expenses.  Mr. Shield and Mr. Lehner

22

agreed that because United Refuse's office was further from Mr. Lehner's home than United Leasing's office, personal commuting expenses from Mr. Lehner's home to United Refuse would also be reimbursed. Initially, Mr. Lehner remained on United Leasing's payroll and United Refuse reimbursed United Leasing for the expense. The reimbursement was intended, and appears to have been in fact, sufficient so that there was no net out-of-pocket expense to United Leasing. When Mrs. Lehner retired from the Virginia State Police, Mr. Shield agreed that United Refuse could hire her and agreed to a weekly salary of $500.00. This was considerably less than she had earned at the Virginia State Police and her skills were clearly worth far more to United Refuse on a full-time basis.

In October 2003, Mr. Lehner had United Refuse pay his salary directly. United Leasing stopped paying his salary and did not seek reimbursement for it. Without regard to employer contributions for Social Security, Medicare or otherwise, Mr. Lehner should have continued to be paid at the annual rate of $80,000. In fact, he was paid a few thousand dollars more.

While a manager generally has the authority to increase his own salary, the test of whether the exercise of that authority is proper is a matter controlled by Va.Code (1950) §13.1-1024.1, the good faith business judgment of the best interests of the limited liability company. United Refuse has the burden of proving that the level of compensation does not fall within this amount. Here, United Refuse showed that there was an initial agreement for an annual salary of $80,000; that Mr. Shield did not agreed to an increase; that United Refuse was unable to meet its cash flow requirements as evidenced by the non-payment of the District of Columbia sales taxes; and that there were no unanticipated change of circumstances with respect to compensation. Mr. Lehner did not rely on an employee of the company, or an accountant or other professional in giving himself a raise.

23

He did not present any evidence of salaries for comparable positions. In considering all of the evidence, the court finds that United Refuse sustained its burden of proof under §13.1-1024.1(C). A raise without supporting analysis at a time when the company is unable to pay all of its bills as they mature is not in the best interests of the company. Mr. Lehner must reimburse to United Refuse all amounts paid for salary in excess of $80,000 (whether paid directly by United Refuse or reimbursed to United Leasing). The same analysis follows for Mrs. Lehner. The amount of overpayment of Mr. Lehner's salary was $4,562.54 and of Mrs. Lehner's, $2,123.08.

The second group of expenses is reimbursements and charges to company credit cards that United Refuse asserts were personal and not business expenses. United Refuse does not object to expenses or reimbursements that it is satisfied were for the benefit of the company, only those that it feels were for the personal benefit of the Lehners. This dichotomy is appropriate under Va.Code (1950) §13.1-1024.1. The good faith business judgment of the best interest of the limited liability company requires that reimbursements or charges to the company credit card be for business purposes. Absent evidence to the contrary, and in this case there was none (except for personal commuting expenses to United Refuse's office which the parties agree were part of Lehner's compensation package), personal expenses are not in the best interests of the company. They are in the nature of additional compensation which, as discussed above, was fixed by agreement at $80,000 a year for Mr. Lehner.

The evidence shows that Mr. Lehner received reimbursement of his car expenses on a mileage basis and also received a fixed monthly car allowance. They were duplicative. He was entitled to one, not both. Both parties agree that the correct amount of the overpayment is $21,370.79.

24

United Refuse seeks reimbursement of $128.25 which was charged to an American Express card issued to Mrs. Lehner for purchases made before she was employed by United Refuse.  There is a dispute as to who made the charges and the purpose of them.  It is unnecessary to resolve the conflicting testimony as to these charges at this point.[7]  What is clear is that they were charges at gas stations during the period when only Mr. Lehner was an employee of United Refuse.  Mrs. Lehner was not an employee and was not entitled to any reimbursements during this period.  If they were to reimburse Mr. Lehner for gas while he met at United Leasing in the Richmond area, the reimbursements were covered by his monthly allowance.  Mr. Lehner is responsible for reimbursing these charges which total $128.25.

United Refuse seeks reimbursement of $5,360.46 for purchases at Carter Lumber in Hayes, Virginia; Lowe's in Richmond, Virginia; Moore's Lumber in Tappahannock, Virginia; and Home Depot in Gloucester, Virginia.  Mr. Lehner testified that the materials were used to improve United Refuse's office in Triangle, Virginia.  United Refuse asserts that the purchases were made "mostly" on Saturdays and Sundays in Hayes and Gloucester which are south of Mr. Lehner's home in Saluda and more than 100 miles from United Refuse's office in Triangle. Virginia.  The essence of United Refuse's argument is that "the probability of Mr. Lehner's *[sic]* having traveled south to buy materials to use 100 miles north of his home is minuscule at best."  Motion at 7.[8]  Its argument is founded on proximity, the proximity of the store to the construction project.

_____

[7]The charges will be discussed further when the issue of joint and several liability is discussed.

[8]United Refuse sought at trial to show, or at least suggest, that the building materials went into the Lehners' garage that he was building.  Raymond C. Cullen testified that Mr. Lehner spoke about the garage project with him in 2003, a time when Mr. Cullen and Mr. Lehner were on good terms.  Mr. Cullen took a photograph of the garage shortly before the end of the trial in 2006.  It showed a large detached garage that was completed on the exterior except for shingling the roof.  The interior was not photographed.  The photographs make obvious that the materials in question did not come close to construct the garage.  At best, the materials were to finish a small portion of the garage.  United Refuse now admits that it "cannot prove that Mr. Lehner used these materials to build his garage."  Motion at 7.

Mr. Lehner testified that he improved United Refuse's office space in Triangle, Virginia, and, in particular, improved a bathroom. He testified that he purchased material at stores closer to his home rather than at similar stores closer to United Refuse's office simply for convenience. He did not recall the details of each purchase and was rather general in his description of the process. His testimony was essentially that he purchased the materials near his home because he knew the stores and it was convenient. He put the materials in his truck and took them to Triangle when he went to work where they were incorporated into United Refuse's office space.

The resolution of this issue rests on the use of the items purchased at the stores. If the materials purchased were used for personal projects, the money expended must be reimbursed to United Refuse. If they were used for company purposes, the expenditure was a proper company expenditure.

The court does not know specifically what was purchased. The type of stores involved are home improvement stores. They certainly stock lumber, but, particularly Lowe's and Home Depot, other building materials, such as paint, fixtures, and appliances. Many such items fit into passenger cars and most fit into the back of a pick-up truck. The court is cautious about Mr. Lehner's credibility, but has not found that he has no credibility. The argument of proximity too quickly passes over other considerations. Price may be a factor. Quality may be a factor. The choice of a store is influenced by familiarity with it and its inventory. An individual may feel more comfortable shopping at a home improvement store in blue jeans than a business suit. He may prefer to separate this type of activity from the daily responsibilities of running a business. Proximity, while a factor, does not sufficiently take into account the fact that once purchases are loaded into a vehicle, it does not generally matter a great deal whether the vehicle travels ten miles or 100 miles. It does matter

26

if the purchases do not fit inside the vehicle, such as a 4' by 8' foot piece of drywall precariously tied to the roof of a passenger car with flimsy twine or 2 x 4s sticking out the back of a half-closed trunk. If purchases conveniently fit into a vehicle, distance becomes less important. Proximity alone is not a sufficient factor to resolve the use of the products purchased in this case.

Neither party has a particularly compelling argument. Mr. Lehner's testimony is vague about the details, but is clear that work was done at United Refuse's office.[9]  He lays a sufficient foundation to support the conclusion that the materials were used there. United Refuse's proximity argument identifies one factor to consider, but little more. In balancing the evidence with respect to these items, the court accepts Mr. Lehner's testimony.

The parties treated all the purchases in this group together. However, there is a distinction between the construction-related purchases discussed above and the remaining purchases. The remaining purchases were at Wal-Mart, and in one instance, at Costco Wholesale in Newport News, Virginia. Mr. Lehner's explanation does not extend to the Wal-Mart and Costco purchases. They are different types of stores. While it is possible that he purchased items there for United Refuse, there is no immediate reason to relate the purchases at these stores to physical improvements at United Refuse. Wal-Mart is more generally associated with consumer household purchases. Costco appeals to both individuals purchasing for household goods and businesses making purchases in bulk. Here, the only information on the Costo charge is the modest amount, $45.00, and the

---

[9]American Express cards were also issued to Robert E. Formeck and Jose R. Arroyo who also purchased items at Home Depot. For example, Mr. Formeck charged $322.33 at Home Depot in Woodbridge on January 18, 2003; $996.17 and $417.34 at Quality Carpet in Woodbridge on January 24, 2003. Mr. Arroyo charged $24.95 and $217.60 at Home Depot in Alexandria on March 9, 2003; $108.61 at Home Depot in Woodbridge on June 4, 2003; $1,407.21 at Quality Carpet in Woodbridge on June 24, 2003; $407.07 at Home Depot in Woodbridge on June 26, 2003; and $84.03 at Home Depot on September 22, 2003 in Stafford. These charges offer some corroboration of Mr. Lehner's testimony that United Refuse's office in Triangle was renovated or improved.

proximity of the store, Newport News, which is too far out of the geographic area to suggest that the purchase was used at or for United Refuse. Both indicate personal use. The Wal-Mart and Costco charges total $584.14 and must be reimbursed by Mr. Lehner.[10]

United Refuse seeks reimbursement of $783.07 for meals.[11] It asserts that the meals were for the personal benefit of the Lehners, not for the company's benefit. It acknowledges that Mr. Lehner was entitled to reimbursement of meals that benefitted the company. It did not seek reimbursement for all meals. It excluded those for which there was a "potentially plausible business purpose." Response to Court Inquiry re Meals, ¶2 ("Meals Br.") (Docket Entry #54). It is a question of personal benefit as opposed to company benefit. Assuming Mr. Lehner ate the food, the question is the purpose of the meals. If they were business related, then they were properly charged to the company; otherwise, the cost must be reimbursed. United Refuse simply does not know who, if anyone, was entertained at each meal. Its proposed rule for decision is, as stated above, the "potentially plausible business purpose." Meals Br. ¶2. It applies a two-prong test. A meal has a potentially plausible business purpose if it meets two tests: (1) the restaurant was in Dumfries or Triangle, Virginia, the environs of United Refuse's office; and (2) the charge is sufficiently large to permit the inference that more than one person ordered food. It argues that if the cost of the meal is too small, then only one person ate and that must have been Mr. Lehner. If he ate alone, then the cost must be a personal benefit, not a company benefit.

---

[10]The proximity argument for the Costco charge is somewhat mitigated by the charge, an even $45.00. Generally, the application of sales taxes results in a number other than an even dollar amount. Here, the charge looks suspiciously like an annual membership fee which may have been billed, and payment authorized, by mail.

[11]United Refuse's total is $766.18 in its Motion. The total does not include the July 22, 2003, charge at Padrino's II Italian Restaurant in Dumfries, Virginia, which appears in the schedule. United Refuse acknowledges the calculation error. Response to Court Enquiry re Meals, ¶1 (Docket Entry 54). The correct amount is $783.07.

28

Mr. Lehner testified that he was unable to remember who he ate with on each occasion, but that all the meals were for business purposes.  The fact that meals were charged to the company credit card only reflects that at least one person ate something.  It tells nothing more.  It does not in and of itself resolve the issue of whether the meal was for the benefit of Mr. or Mrs. Lehner or for the benefit of the company.  The location of the restaurant is a factor.  Most were near United Refuse's business premises.  Several were in Richmond where United Leasing had its office.  There were some in Fredricksburg and Tappahannock, which are between Lehner's home and United Refuse's office.  One was in Deltaville where Mr. Lehner kept his boat and one in Yorktown where United Refuse had no business and which is not particularly far from Mr. Lehner's home in Saluda. Most were during the week.

The meals outside the vicinity of United Refuse's office or area of operations support the inference that they were not for the benefit of United Refuse.[12]  Those in Fredericksburg and Tappahannock support the inference that they were dinners on the way home from United Refuse's office and were for the convenience of Mr. Lehner, not for the benefit of United Refuse.  This does not exclude the possibility that those within United Refuse's area of operation were not simply lunches for Mr. Lehner.  The amount of the charge, while a factor, is not particularly helpful.[13] There is no evidence as to the menu or costs at any of the restaurants which makes it hazardous to draw conclusions as to whether one or two people ate lunch or dinner simply on the size of the

---

[12]The American Express statements reflect out-of-area meal charges by Jose R. Arroyo to whom a company American Express card was also issued, for example, on April 27, 2003 at the Happy Clam, Colonial Beach, $74.27; on September 24, 2003 at The Olive Garden, Falls Church, $48.96; on November 20, 2003 at Tom Sarris Orleans House, Arlington, $83.60.  They were not discussed at trial and their intra-company disposition is not known, but they are suggestive of the shortcomings inherent with placing too much weight on proximity.

[13]The court would have thought that large charges would have received the greater scrutiny because, it might be argued, they might reflect a certain extravagance generally inconsistent with the circumstances of the case.

charge.  While there is a fair inference that Mr. Lehner paid for the entire bill, the possibility that bills were split cannot be excluded.[14]  It cannot be assumed that every bill reflects a purchase of more than a cup of coffee, a sandwich or a small hospitality.

The inferences that can be drawn in favor of either party are weak.  However, they do provide a basis for making a determination as to whether the expenditures were for business or personal use. Taking into account the proximity of the restaurant to United Refuse's office, the area of its operations, the frequency and timing of the charges, and the amount of the charges, the court finds that $463.21 of the charges were for Mr. Lehner's personal benefit.

Nine charges correlate with motel bills for which United Refuse also seeks reimbursement. They appear to have been in connection with the motel stays and will be considered with the motel bills.

United Refuse seeks reimbursement for 13 motel bills incurred between June 27, 2003, and April 8, 2004 totaling $1,037.27.  The court will also consider the nine meals that correlate to the motel stays.  They total $519.92.  All were in the vicinity of United Refuse's office.  None correspond to hearings held in this court.  Those will be considered later.

Mr. and Mrs. Lehner assert that there were valid business reasons to spend the night in Northern Virginia.  Mrs. Lehner testified that she attended union meetings that ran late at night. Mrs. Lehner also wanted to ride the routes so that she could better understand the business.  To do this, she had to be at United Refuse's office when the  trucks left in the early morning hours.  The fair inference from the testimony was that there were also other occasions when either one, or the

---

[14]For example, the August 20, 2003 American Express statement reflects Mr. Lehner's August 15, 2003 charge of $11.05 at Golden Corral in Dumfries to which United Refuse objects.  The same statement also reflects a charge by Mr. Arroyo on the same day at the same restaurant for $22.05.  That same day Mr. Arroyo also charged $58.89 at Padrinos Pizza in Dale City.

other, or both needed to be at work early or stayed late.  Because the distance to their home was over

100 miles, it was impractical to make the trip home on those occasions.  These, they say, benefitted

the company because it enabled them to be available at these hours.

The thrust of United Refuse's argument is that because Mrs. Lehner could only give one

concrete example of a business justification for staying overnight in Northern Virginia – the union

meeting – the rest were for her, or Mr. Lehner's benefit, for example, because they were too tired

to make the long drive home.  Motion at 6.

It is difficult to resolve the purposes of the motel stays.  Mrs. Lehner could not explain the

specific purpose of each motel stay, but testified that they were all business related.  There was no

other significant testimony.  United Refuse obviously gives Mr. and Mrs. Lehner no credit.  For

example, United Refuse states:

> "The Court's *[sic]* giving credence to the explanation that Mr. Lehner bought
> building supplies .   .   . is astounding." Motion at 7.

> "The  gasoline charges are only **$128.25** .   .   ., but the fact that the Lehners would
> give false testimony even with regard to such a minuscule amount ought to give the
> Court pause in crediting any of their testimony." *Id.* at 8.  (Emphasis in original).

> "The Court (and United Refuse) have been 'had'  The testimony of the Lehners is
> patently false – and, this time (at least), not as a result of any faulty memory." *Id.*
> at 8.

The court is not concerned with counsel's harsh characterizations or zealous advocacy.  Counsel

ought to be a zealous advocate.   The point is different.  United Refuse does not credit Mr. or Mrs.

Lehner's testimony at all.[15]   The court is cautious of their credibility, but does not dismiss their

testimony.

---

[15]United Refuse seemingly credits Mrs. Lehner's testimony as to one union meeting.

31

What the court is left with is Mr. and Mrs. Lehner's testimony without any evidence to the contrary except the fact of the motel stays.  It is known that there were 13 nights spent at motels – two for two nights, the rest for one night – over a period of about nine months.  Some of the charges preceded the breakdown in the relationship between Mr. Lehner and Mr. Shield.  The same conduct – staying overnight in Dumfries or Triangle – followed the breakdown in the relationship.  All but one motel – the Ramada Inn in Fredericksburg on April 7 and 8, 2004 –  were in Dumfries or Triangle,  the immediate vicinity of United Refuse's office.  None was a luxury hotel.  Motion at 6.  Mrs. Lehner gave one concrete example of the need to stay overnight, a union meeting.  Mr. and Mrs. Lehner gave general statements as to other reasons for staying overnight.  There was no prohibition on such expenditures if they benefitted the company.  United Refuse concedes the stay for the union meeting.  The question is whether there was a company benefit for the rest, such as encouraging the Lehners to work later hours or be present early in the morning to ride the routes. If the court gave the Lehners no credit, it would still be a difficult question because the purpose of the stays would still be unclear.  United Refuse which has  the  burden of proof would not prevail. However, the court does give the Lehners some credit and, all in all, in examining the sparse facts presented and evaluating the credibility of the witnesses, the court finds that the Lehners have shown that it is more probable than not that the 13 nights in motels, principally in Dumfries and Triangle near United Refuse's office, were for the benefit of the company and not for their personal benefit. The meals that correlate with the motel stays follow the nature of the motel stays.

Other matters are easier to resolve than the motel stays.  The expenses at the Tides Inn do not appear to be for the benefit of the company.  While company retreats may be a legitimate business purpose, in this case, it appears that the expenses were more in the nature of personal

32

expenses. While it is true that another employee was also invited to Tides Inn, the accommodations offered were different and there does not appear to have been any company program, planning or discussion and it was at a time when the company was not meeting its cash flow requirements. The total expenses were $1,892.00 which benefitted both Mr. and Mrs. Lehner.

The tax preparation by Frank & Company of the Lehners' personal tax return and the Lehners' personal income taxes paid by United Refuse are personal expenses. The total amount is $7,574.16 and benefitted both Mr. and Mrs. Lehner.

The New Orleans trip by both Mr. and Mrs. Lehner was intended to benefit the company. They attended a trade show there. However, it is unclear why both were necessary, particularly while there were cash flow problems. The excess expenditure of $783.31 benefitted Mrs. Lehner.

Mrs. Lehner's car payments must also be reimbursed. They were $3,851.42. Both are responsible.

The parties agree that Mr. Biss' attorney's fees should be reimbursed. After the trial they agreed to the reduced amount of $3,616.00. The fees benefitted both Mr. and Mrs. Lehner.[16]

There are miscellaneous matters that are also personal: the Chimney Sweep ($2,400.00);[17] the plumbing bill ($575.00); the pick-up truck ($2,770.00);[18] postage for a package to Mr. Biss ($14.12); a car alarm ($240.00); Mallory-Lincoln ($849.54); Jeff's Top Shop ($2,290.00); and other

---

[16]The court notes that United Refuse attached additional documents to its response with respect to this matter. The court cannot consider these additional materials. They are not a part of the trial record. Nor is there a reason to consider them since the parties agree to the amount.

[17]This was for the purchase and installation of a Regency Woodstove. United Refuse references a $2,100.00 payment for "a heating appliance installed in the Lehners' personal residence". Draft Order ¶3(j) (Docket Entry 30). This appears to be the woodstove.

[18]Mr. Lehner argues that this purchase off-sets United Refuse's failure to pay his salary for the last pay period. This was taken into account in computing his salary overpayment discussed above.

miscellaneous charges ($316.90 and $76.00). The court cannot determine what the $100.00 payment to VCOP was for. Mrs. Lehner retired from the Virginia State Police and VCOP may be some sort of Virginia police association fund. If so, businesses frequently make such donations. Without knowing what it was for, the court cannot find that it was a personal expense. The nature of Mallory-Lincoln and Jeff Top Shop appear to have no relationship to United Refuse's business on their face and are more likely personal expenses. A total of $6,761.56 is the joint responsibility of the Lehners and $2,770.00 is Mr. Lehner's responsibility.

United Refuse complained of certain magazine subscriptions. A manager has reasonable discretion in selecting the reading material used by the company in a public area such as a reception area. The fact that the manager or an employee may be favorably disposed to a particular subscription or may even read it does not make it an inappropriate choice or purchase. The subscriptions were delivered to United Refuse's office. Except for the names of the subscriptions and Mr. Lehner's interest in them, there is nothing to suggest that they were misused. The fair inference from the testimony is that the subscriptions were directed to United Refuse's office, generally available to all employees and available to clients and others who may have visited the office.[19]

Finally, United Refuse asserts that none of the travel expenses for Mrs. Lehner during the trial in *United Refuse LLC v. United Leasing Corporation,* Adv. Proc.04-1196 should be allowed. It asserts that her only interest in the case was to defend her ownership interest in United Refuse. Thus, any expenses during the trial for her are personal. It is, however, uncontroverted that she worked at United Refuse from the time she retired from the Virginia State Police until the judgment

---

[19]United Refuse subscribed to The Wall Street Journal (recurrent charge on American Express statements) and Food & Wine Magazine ($29.00 on August 7, 2003 reflected on August 20, 2003 American Express statement).

in the adversary proceeding. In the course of her employment, she became familiar with the operations of United Refuse and appeared to the court to be, together with Mr. Lehner, helpful to United Refuse's counsel in preparing and trying the case. At times, it was difficult to separate the ownership aspects of the case from the determination of the extent, validity and priority of lien issues. The same evidence was used for both. In fact, the overlapping nature of the evidence was one reason the parties gave to the court to hear them together. Counsel were correct about the overlap. Understanding the entire course of the transaction was necessary to unravel the financial obligations between the entities and the ownership of United Refuse. Mrs. Lehner's testimony was helpful to both aspects of the case. She was the designated representative of United Refuse during the trial and sat at counsel table. Tr. 1/25/2005 at 107. Mr. Lehner was excluded from the courtroom.

The court also notes that the hotel at which they stayed during the course of the trial charged a per room rate, not a per person rate. Even if Mrs. Lehner were unnecessary, there was no additional charge for her staying over as far as room rates are concerned.

**4. Kickbacks.** United Refuse alleges that the Lehners:

*b*. Cause[ed] or allow[ed] contractors to inflate billings to United Refuse in excess of the fair value of the work performed and, upon information and belief, [took] "kickbacks" from one or more such contractors;

*e*. Cause[d] or permit[ed] employees of United Refuse to make trash pickups from persons not customers of United Refuse, to retain the monies paid to them by such non-customers, to dispose of such trash at the cost of United Refuse, and upon information and belief, [took] "kickbacks" from employees of United Refuse to permit such activities;

*f*. Implement[ed] a policy of paying commissions to salespersons of United Refuse for collecting the accounts payable of United Refuse, including the current accounts payable, out of which commissions the salespersons made "kickbacks" to the Lehners.

Counterclaim, ¶7 (Docket Entry 1).

United Refuse presented no evidence on these matters.

    **5.  Personal Creditors.**  United Refuse alleges that the Lehners:

*m.* Falsely report[ed] to this Court and the creditors of United Refuse that their
personal creditors were creditors of United Refuse;
*n.* S[ought] authorization of this Court to permit payment to their personal creditors
out of the assets of United Refuse

*Id.*

    United Refuse presented no evidence on these matters.

    **6. Proof of Claim.**  United Refuse alleges that the Lehners:

*o.* File[ed] a false and fraudulent proof of claim against United Refuse.

*Id.*

    The record of this court in the main case reflects that the Lehners did file a proof of claim,
but that it was disallowed as untimely.  There was no adjudication on the merits of the proof of
claim.  *In re United Refuse LLC,* (Proof of Claim 28; Docket Entry 300).  The Lehners' motion to
vacate the order disallowing their proof of claim was denied because they were unable to show that
they could have prevailed on the objection as to the tardiness of the filing of the proof of claim.
They presented no potentially legally sufficient excuse for the late filing.  *Id.*  (Docket Entries 370
and 377).  United Refuse presented insufficient evidence from which the court could find fraudulent
intent.  It proved no damages.

    **7. Mismanagement.**  United Refuse alleges that the Lehners:

*p.* Fail[ed] to manage United Refuse for the benefit and in the interests of United
Refuse.

*Id.*

    United Refuse did not raise any additional matters not set out above.  It appears to have
abandoned this issue.  In its Supplemental Brief, it stated, "United Refuse does not assert that either

or both of the Lehners failed properly to exercise their business judgment on behalf of the LLC."
Supp. Br. at 2-3.

### Joint and Several Liability

United Refuse asserts that James C. Lehner and Suzanne Lehner are jointly and severally
liable on all claims while they were both managers of United Refuse.  It asserts that joint liability
arises because of the Lehners' joint control and should be imposed where personal expenses
benefitted them jointly.  The general rule of law is that a party is liable only for his or her own
conduct unless the conduct is the conduct of two or more parties acting jointly, for example, joint
tortfeasors or joint responsibility under a note or a contract.  Joint liability may derive from the
relationship between the parties, for example, as partners.  However, the mere fact that two
individuals are managers of the same Virginia limited liability company at the same time does not
in and of itself create joint liability for the individual misconduct of one of the managers.  In a
corporate setting, there is a difference between the act of a board of directors and the act of an
individual director.  *Monacan Hills, Inc., v. Page,* 203 Va. 110, 116, 122 S.E.2d 654, 657 (1961);
*Mosell Realty Corp. v. Schofield,* 183 Va. 782, 793, 33 S.E.2d 774, 779 (1945).  The mere fact that
both Mr. and Mrs. Lehner were managers at the same time is not in and of itself sufficient to create
joint and several liability.

The court cannot find a factual basis for attributing all breaches to both Mr. and Mrs. Lehner
as managers.  Mr. Lehner was originally the sole member and manager of United Refuse, having
accepted the assignment directly from United Leasing.  At that time, Mrs. Lehner was employed by
the Virginia State Police and was not a member, manager or employee of United Refuse.  She later
retired from the Virginia State Police and began working at United Refuse.  Still later, she became

37

a member and a manager.  Mrs. Lehner's employment and weekly salary of $500.00 was approved by United Leasing.

Mr. and Mrs. Lehner's duties sometimes overlapped, but were not substantially duplicative. Generally, Mrs. Lehner brought her Virginia State Police experience and skills to United Refuse, skills that Mr. Lehner did not possess.  Both were not present at United Refuse's office every day.

Mr. Lehner performed more in the capacity of a chief executive officer.  He was the one who United Leasing assigned to the job of rehabilitating United Refuse and preparing it for sale.  He had previous experience in repossessions and had been a long-time employee of United Leasing.  He set up the initial operating procedures and organized the rehabilitation effort.  He ran the company himself until his wife arrived.  Mrs. Lehner's duties were not clearly delineated.  While some were discussed and were important, they did not rise to the level of Mr. Lehner's responsibilities.  While she was the person in charge of the office when Mr. Lehner was not present, he remained the person in charge of the company.  Their relative importance, which also reflects the type of work they were doing, is reflected in their compensation, both of which were approved by United Leasing.  Mr. Lehner was paid about three times as much as Mrs. Lehner.  While both may have become managers later in the operation of United Refuse, they were never equals in their job responsibilities.  There was no requirement that checks be jointly signed or that there be agreement between them before certain, let alone all, actions be taken.  The court concludes that Mr. and Mrs. Lehner are responsible for their own acts, but not generally the acts of the other.  To the extent that United Refuse proved that they acted jointly as to a particular item, they are both liable for that item.

One set of expenditures is on a different footing than the others.  Those are the American Express charges.  It can generally be inferred that the charges on each American Express credit card

38

were made by the person to whom the card was issued.  While use of a card is not restricted to only

the person whose name appears on it, there was no evidence to the contrary except for the $128.25

gas charges to Mrs. Lehner's card before she was employed by United Refuse.  She denied that she

had possession of the card at that time and denied making the charges.  Generally, credit cards used

at gas stations can be used by anyone.  The charge is activated at the pump by inserting the card.

No charge slip is signed.  No attendant looks at the card, verifies the identity of the user or verifies

a signature.  At the time the card was used, Mr. Lehner had business in Richmond where the card

was used because he reported to United Leasing's office from time to time.[20]  He was on good terms

with United Leasing at the time.  United Refuse produced no evidence to contradict this testimony.

It does not appear that there were any other charges on Mrs. Lehner's card before she was employed

by United Refuse.  While the testimony, if some is disregarded, is susceptible to the inference that

Mrs. Lehner made the charges, it is also consistent with Mr. Lehner and Mrs. Lehner driving into

Richmond together, Mr. Lehner dropping his wife off at her office, purchasing gas and going to

United Refuse's office.  United Refuse would disregard Mrs. Lehner's testimony.  The Lehners'

testimony, United Refuse argues, is "patently false."  Motion at 8.  "[T]he Court should pause in

crediting any of their testimony."  *Id.*  The court is cautious with the Lehners' testimony, but gives

it greater weight than United Refuse's suspicion that Mrs. Lehner used the card to purchase gas for

her car because the card was used in Richmond.[21]  Except as otherwise discussed, the charges on the

American Express cards will be assessed against the person to whom the card was issued.

---

[20]*See* Exhibit 91, Transcript of court's ruling, *United Refuse LLC v. United Leasing Corporation,* Adv.Proc.
04-1196 at 18-19.

[21]United Refuse submitted a Declaration under penalty of perjury with its motion to reconsider executed by
William Daniel Sullivan, the attorney who tried the case.  (Docket Entry 30, Exhibit 2). The court will not consider it.
It seeks to supplement the record with new evidence after the conclusion of the trial without a motion or proper showing.

The court recognizes that it is difficult in these circumstances to determine who makes what decision, particularly with respect to authorizing payment of particular bills or authorizing particular reimbursements and it could be argued, therefore, that United Refuse has failed to prove that either Mr. or Mrs. Lehner is liable. Someone is responsible. Mr. and Mrs. Lehner are the only two who could be responsible. In the absence of other sufficient evidence, the one primarily responsible for setting up the processes and operating them is that someone. In this case, that is Mr. Lehner. He was ultimately responsible for all actions taken in the ordinary course of the company's business. He is the one who established the business and the business practices.[22] He was essentially the chief executive officer and the chief operating officer. United Leasing always looked to him, not to Mrs. Lehner, as the person who was suppose to report to United Leasing and who was responsible for United Refuse's operations and success. Thus, he is responsible for all inappropriate disbursements and reimbursements.

In addition, United Refuse is entitled to obtain repayment of an erroneous disbursement or reimbursement from the person who was paid or directly benefitted from it. Thus, if Mrs. Lehner was the beneficiary, she will be liable for the repayment as will Mr. Lehner. There should be joint liability for these expenditures – Mr. Lehner because he set the processes up and Mrs. Lehner because she benefitted from them.[23]

## Conclusion

For the reasons set forth above, judgment will be entered in favor of United Refuse, L.L.C.,

---

[22]The court is not satisfied from the evidence that the in-house processes by which bills were paid or reimbursements were approved significantly changed after Mrs. Lehner became a manager.

[23]The court recognizes that in the case of a married couple, a benefit to one necessarily benefits the family, meaning the other. But, that proves too much and the benefit must be directly to the affected party. Here, that means Mrs. Lehner because Mr. Lehner is responsible, absent evidence to the contrary, in any event.

and against James C. Lehner, individually, in the amount of $29,878.93 and against James C. Lehner

and Suzanne Lehner, jointly and severally, in the amount of $26,601.53.

      Alexandria, Virginia
      June 7, 2007

                      /s/ Robert G. Mayer
                      Robert G. Mayer
                      United States Bankruptcy Judge

copies to:

William Daniel Sullivan
Kermit A. Rosenberg

Steven S. Biss
P.O. Box 592
Richmond, Virginia

13374

41